IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:14-cv-43 (WOB-JGW)

CONNIE WALLING                                                          PLAINTIFF

VS.

CITY OF NEWPORT, ET AL.                                               DEFENDANTS

MEMORANDUM OPINION AND ORDER

This is a civil-rights action filed pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213. Plaintiff Connie Walling alleges that members of the Newport Police Department ("NPD") discriminated against her on the basis of her disability and violated her Fourth Amendment right to be free from excessive force during an encounter at the private peer-support group PIER (Personal Involvement Empowering Recovery) on July 9, 2013.

This matter is before the Court on Defendants' motion for summary judgment. Doc. 32. The Court heard oral argument on this motion on Friday, September 4, 2015. Jay T. Bosken represented Plaintiff Connie Walling, and Jennifer Langen represented Defendants. Also present was Louis Wolf. Official court reporter Joan Averdick recorded the proceedings.

The Court now issues the following Memorandum Opinion and Order. For the reasons stated herein, the Court will grant Defendants' motion for summary judgment in part and deny it in part.

## I. FACTS[1]

### A. Walling's and Russell's Medical Conditions

Plaintiff suffers from a mental disability, dissociative identity disorder, and becomes very anxious around large groups of people. Doc. 36, at 14; Doc. 43, at ¶ 3. She testified that she has at least nine different personalities. *Id.* Two of Plaintiff's personalities, "Amanda" and "Andrea," have homicidal tendencies, and "Amanda" has suicidal tendencies as well. *Id.*

Plaintiff also has a physical disability. Her left arm is in a fixed position in front of her, and "it is very painful" when moved behind her. Doc. 43, at ¶ 4. Additionally, Plaintiff "customarily wear[s] a neck brace" and alleges that she was wearing a neck brace on the day of the incident with NPD. *Id.* ¶ 5.

Plaintiff's son, Kevin Russell, also suffers from mental illnesses. Plaintiff testified that Kevin has personality disorder, intermittent explosive disorder, schizoaffective disorder, schizophrenia, bipolar disorder, and ADHD. Doc. 36, at 6.

### B. Walling's and Russell's Participation at PIER

PIER is a "peer driven recovery center" in Newport, Kentucky. Doc. 35, at 4. Volunteers that have experience dealing with depression, alcoholism, and substance abuse -- but not any medical training -- provide assistance to clients currently dealing with

---

[1] The parties largely agree on the undisputed facts for the purposes of Defendants' summary-judgment motion. Defendants' motion presents the facts in an evenhanded manner, drawing inferences in Plaintiff's favor, Doc. 32, at 3-7, and Plaintiff "concur[red]" in Defendants' statement with some additions, Doc. 41, at 2-4.

2

similar issues. *Id.* Some PIER volunteers form closer relationships with their clients and take on the "self-appointed" role of "advocate" for that client. *Id.* at 3-4.

Walling began going to PIER for support for her son early in 2013. *See id.* at 17; Doc. 33, at 3. When Kevin was in crisis, she would drive him to PIER to see his personal advocate, Chad Ponchot. Doc. 33, at 3-4. Eventually, Walling developed a relationship with another PIER volunteer, Louis Wolff, and Wolff became her personal advocate. Doc. 35, at 6.

### C. The Events of July 9, 2013

On the morning of July 9, 2013, Russell had been yelling and screaming and had punched a hole in the wall of Plaintiff's home. Doc. 36, at 16. Plaintiff testified that when her son behaves this way she cannot handle it, and his behavior causes her additional personalities to surface. *Id.* Plaintiff called PIER, explained what was happening with Russell, and then drove him to PIER so that his advocate, Ponchot, could calm him. *Id.*

Russell testified that Plaintiff "was not herself on the way down" to PIER. Doc. 34, at 5. Another of her personalities, "Marie," who is a child, emerged. *Id.* Russell further testified that he was scared because "Marie" does not know how to drive a car. *Id.*

Russell also testified that Plaintiff was "very frantic because she was -- she was becoming herself and then becoming somebody else interchangeably" when they arrived at PIER. *Id.* After their arrival, Plaintiff sat down next to the door while her son went to speak to Ponchot. *Id.* Russell explained the situation, and Ponchot stated

3

that, if her condition worsened, PIER "would have to call someone to help." *Id.* Russell also testified that Plaintiff "wasn't being violent or anything; it's just that it was too much for [Ponchot] to deal with." *Id.*

Plaintiff testified that she was trying to talk to Ponchot, but more and more people began entering the room, which scared her. Doc. 36, at 16. She was trying to communicate verbally with Ponchot but did not feel like he could hear her, so she started to bang her hand on a nearby table. *Id.* Plaintiff testified that at this point the Fire Department arrived. *Id.* The addition of these people to the room -- Plaintiff testified that there were approximately fifteen or twenty people nearby, including PIER clients and volunteers -- significantly increased her anxiety. *Id.*

As to this conversation, Ponchot testified:

> I probably talked to her for about 40 minutes. I'm trained in mental health first aid, so I'm in the process of doing an assessment to determine whether or not I think she is suicidal or able to harm someone else. And then I give her a moment to talk, so I can listen and see, you know, where she's going with things, if they're rational, if they're irrational. And then as the conversation went, the more she talked, the more she was being interrupted. It would be like a brief silence or a quick turn and you would know that she had changed persons. Now, at that time, I was very versed on who her multiple personalities were. At this time, I couldn't call them by name. But she has one that is homicidal and suicidal. And when that one surfaced -- always trying to err to the side of safety -- we had her under control. But because that one had surfaced, we decided to go ahead and we really went across the street to the paramedics and just said, hey, can you come and take a look at this person, you know.

Doc. 33, at 5.

Plaintiff stated that five EMTs arrived at PIER, followed approximately forty-five minutes thereafter by three police officers.

4

Doc. 36, at 18, 20. Plaintiff had a conversation with the EMTs, during which the EMTs attempted to convince her to go to the hospital. *Id.* at 19. Walling was willing to go to the hospital, but she did not want to be transported in an ambulance due to the expense. *Id.* Plaintiff also stated that she made physical movements -- such as showing the EMTs her inner arms -- to indicate that she did not intend to harm herself. *Id.* at 20.

When the police arrived, they entered the front room of PIER. *Id.* at 23. Plaintiff testified that Officer Marksbury had his hand on his stun gun when he entered, and she told him that he could not use it on her because it would kill her -- Plaintiff has a steel rod in her neck. *Id.* Officer Marksbury responded that he had no intention of using the stun gun and removed his hand from it. *Id.* Plaintiff then asked the police officers if they would leave the room, and they complied with her request. *Id.*

The police offers reentered the room shortly thereafter, and Plaintiff agreed to take her anti-anxiety medications (Baclofen and Valium) an hour earlier than scheduled in order to help calm her. *Id.* at 24. For approximately fifteen to twenty minutes, all parties waited for Plaintiff's medication to start working. *Id.* at 24-25. At the end of that time, Plaintiff had to go to the restroom. *Id.* at 24. The police, EMTs, and PIER staff allowed her to enter the restroom alone and lock the door. *Id.*

When Plaintiff exited the bathroom, she testified that she was "tackled like a linebacker" from behind by a police officer. *Id.* Plaintiff, her son, and Wolff all filed affidavits stating that they

5

heard a police officer say, "Take the nut down," before Walling was tackled. Doc. 43, at ¶ 27; Doc. 44, at ¶ 25; Doc. 44, at ¶ 26. Plaintiff also stated that Officer Marksbury was by the back door and in her line of sight during this time, so -- according to Plaintiff -- he was not the officer who tackled her. Doc. 36, at 25-26.

Plaintiff testified that, after she was tackled, she struggled with the police officer who was trying to handcuff her. *Id.* at 26. The officer wrenched her left arm -- the one in a fixed position -- behind her, and "just popped it." *Id.* Plaintiff was able initially to get her left arm free of the handcuffs, and tried to tell the officer that her arm was stuck in front of her. According to Plaintiff, the police officer did not listen, said, "Oh, I'll get you this time," and then wrenched her arm behind her again in order to handcuff her. *Id.* at 27. Plaintiff also testified that, after securing her in handcuffs, the police officer pushed her face forward into the ground and twisted it such that her cheek was against the floor, causing her neck to "pop" as well. *Id.* at 28.

After she was restrained, Plaintiff continued to resist the officers. She testified that she scooted on the floor towards Officer Marksbury, but did not get close enough to kick or strike him. *Id.*

Once the police had Plaintiff restrained in handcuffs, they transferred her to a gurney and replaced the handcuffs with softer restraints. *Id.* at 29. Plaintiff was then transported to St. Elizabeth's Medical Center in an ambulance and placed on a seventy-two hour psychiatric hold. *See id.* at 30.

6

## II. ANALYSIS

### A. ADA Claims

Plaintiff pled claims against Defendants for discrimination on the basis of her known disability, citing 42 U.S.C. § 12188. But § 12188 is a part of Title III of the ADA and applies only to private entities that own, lease, or operate a place of public accommodation. *Id.* § 12182(a). There is no evidence in the record that any Defendant is a private entity who owns, leases, or operates a public accommodation.

But, although it remains an open question in the Sixth Circuit, Title II of the ADA arguably applies to police officers who seize an individual with a disability recognized by the ADA. *See Tucker v. Tennessee*, 539 F.3d 526, 534-36 (6th Cir. 2008) (addressing whether Plaintiffs had made out a case of intentional discrimination on the basis of a disability during an arrest and whether the arresting officers failed reasonably to accommodate Plaintiffs' disabilities without deciding whether Title II applies to arrests); *see also Everson v. Lies*, 412 F. App'x 771, 774-75 (6th Cir. 2011) (relying on *Tucker* to hold that Plaintiff had not adduced sufficient evidence of intentional discrimination without deciding whether Title II applies to arrests). Because the Court finds that the evidence, when viewed in the light most favorable to Plaintiff, establishes that there is a genuine dispute of material fact as to whether a member (or members) of NPD discriminated against Plaintiff on the basis of her disability, the Court will construe her disability claims as arising under Title II of the ADA.

In order to state a claim under Title II of the ADA based on the use of force at issue, Walling must show that she "was *intentionally* discriminated against *solely because of . . . her disability* in the context of [a] public service, activity, or program, or that reasonable accommodations were not made to provide [her] with [accommodations] that were as effective as those provided to non-disabled persons." *Tucker*, 539 F.3d at 535 (citing *Bircoli v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007); *Dillery v. City of Sandusky*, 398 F.3d 562, 567-68 (6th Cir. 2005)).

### 1. Claim against City of Newport

Because the ADA imposes liability on employers and "any agent" of a covered employer, 42 U.S.C. § 12111(5)(A), the City of Newport is vicariously liable under Title II of the ADA for the actions of its employees. *See Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574-75 (5th Cir. 2002); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *Rosen v. Montgomery Cnty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997); *DeVito v. Chicago Park Dist.*, 83 F.3d 878, 881 (7th Cir. 1996). The City is therefore liable to Plaintiff if any of its employees violated Walling's rights under the ADA.

Viewing the facts in the light most favorable to Plaintiff, the record contains evidence that would allow a reasonable jury to conclude that a member (or members) of NPD intentionally discriminated against Plaintiff on the basis of her mental-health disability. Plaintiff, her son, and Wolff filed affidavits stating that they heard an officer say, "Take the nut down," just before Plaintiff was tackled. Doc. 43, at ¶ 27; Doc. 44, at ¶ 25; Doc. 44, at ¶ 26.

Defendants assume that such a statement was made for purposes of summary judgment. Doc. 47, at 1 n.1. There thus exists a jury question as to whether the City of Newport intentionally discriminated against Plaintiff on the basis of her mental-health disability.

A reasonable jury could also conclude that a member (or members) of NPD intentionally discriminated against Plaintiff on the basis of her physical disability. Plaintiff's description of being tackled by an officer who forcibly pulled her left arm -- obviously in a fixed position in front of her body -- behind her twice, causing Plaintiff's shoulder to pop, and who pushed her face into the ground after she was subdued, causing her neck to pop -- in spite of the fact that Plaintiff was wearing a neck brace -- supports this conclusion. Doc. 36, at 26-28. There thus likewise exists a jury question as to whether the City of Newport intentionally discriminated against Plaintiff on the basis of her physical disability.

The Court accordingly denies Defendants' motion for summary judgment as to Plaintiff's ADA claim against the City of Newport.

### 2. Claims against Other Defendants

The Court, however, grants Defendants' motion for summary judgment on Plaintiff's ADA claims as to the Newport Police Department, Lt. Ripberger, and Officer Marksbury. These parties are not proper defendants in an action under the ADA. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808 n.1 (6th Cir. 1999) (reasoning that an ADA claim against a government official in his individual capacity must be dismissed); *Matthews v. Jones*, 35 F.3d 1046, 1049

9

(6th Cir. 1994) (holding in the § 1983 context that a Kentucky municipal police department is not an entity capable of being sued).

    **B.    Section 1983 Claims**

        **1.    Claim against Newport Police Department**

The Court grants summary judgment to Defendant Newport Police Department on Plaintiff's § 1983 claim, because it is not an entity capable of being sued under § 1983. *Matthews*, 35 F.3d at 1049.

        **2.    Claim against Lt. Ripberger**

The Court grants summary judgment to Defendant Lt. Ripberger on Plaintiff's § 1983 claim, because Plaintiff does not contest that Lt. Ripberger was not present at PIER on July 9, 2013. Doc. 41, at 9 ("The Plaintiff concurs with [Defendants] that Lt. Ripberger was not present . . . .").

        **3.    Claim against Officer Marksbury**

The Court grants summary judgment to Defendant Officer Marksbury, because Plaintiff testified multiple times in her deposition that Officer Marksbury "never got close to [her]" and that he did not participate in the tackle that she alleges violated her rights. Doc. 36, at 25-26, 28, 30.

Plaintiff argues that Officer Marksbury is liable under § 1983 for failing to intervene to stop a violation of Plaintiff's Fourth Amendment rights. Doc. 41, at 8 (citing *Bruner v. Dunaway*, 684 F.2d 422, 425-27 (6th Cir. 1982)). But Plaintiff does not cite evidence in support of this argument, and no evidence suggests that Officer Marksbury had an opportunity to intervene and chose not to do so.

10

### 4. Claim against the City of Newport

Plaintiff asserted a § 1983 claim against the City of Newport for failure to train its officers, primarily relying on *City of Canton v. Harris*, 489 U.S. 378 (1989). A § 1983 failure-to-train claim requires a plaintiff "to prove 'three distinct facts': 'that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)).

Plaintiff has not adduced *any* evidence related to the City of Newport's training of its police officers. She therefore cannot show that its training program is inadequate, that the program's inadequacy is due to the City of Newport's deliberate indifference, or that the inadequacy caused her injuries. The Court accordingly grants summary judgment to the City of Newport on Plaintiff's § 1983 claim.

### C. Claim under KRS § 15.520

The Court grants summary judgment to Defendants on Plaintiff's claim alleging a violation of Kentucky Revised Statutes section 15.520. That statute does not grant any rights to private citizens. Rather, the law sets out the procedures that police departments must follow to protect officers' due-process rights in the event that citizens or other law enforcement officials file complaints against them. Ky. Rev. Stat. Ann. § 15.520(4)-(8).

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment.

Having heard from the parties, and the Court being advised,

**IT IS ORDERED THAT:**

(1) Defendants' motion for summary judgment, Doc. 32, be, and is hereby, **granted in part and denied in part.** Defendants Newport Police Department, Lt. Ripberger, and Officer Marksbury are hereby **dismissed as parties in this action;**

(2) Plaintiff's claim against the City of Newport pursuant to Title II of the ADA, and only that claim, remains before the Court; and

(3) The parties shall promptly contact the assigned United States Magistrate Judge to schedule a settlement conference.

This 9th day of September, 2015.



Signed By:
*William O. Bertelsman* WOB
United States District Judge

TIC: 20 min.